**The below described is SIGNED.**

**Dated: September 26, 2006**
_____
**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**



_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>CROCKER COMPANIES, INC. dba CITY TITLE INSURANCE AGENCY dba CITY TITLE INSURANCE BROKERAGE,<br><br>Debtor. | Bankruptcy No. 03-22839<br><br>Chapter 7 |
| STEPHEN W. RUPP, Trustee of the Bankruptcy Estate of Crocker Companies, Inc.,<br><br>Plaintiff,<br><br>vs.<br><br>QUALITY LINEN & TOWEL SUPPLY CO., a Utah corporation; LYNN CRAYK, an individual,<br><br>Defendants. | Adversary Proceeding No. 04-2840<br><br>Judge Judith A. Boulden |

## MEMORANDUM DECISION ON TRUSTEE'S
## MOTION FOR SUMMARY JUDGMENT

Before the Court is the Chapter 7 Trustee's (Trustee) Motion for Summary Judgment

(Motion). The Motion requires the Court to determine whether two transfers of $150,000 each

from the Debtor to Defendants Quality Linen & Towel Supply Co. (Quality Linen) and Lynn

Crayk (Crayk) are constructively fraudulent under § 548(a)(1)(B) of the Bankruptcy Code and/or

§ 25-6-5(1)(b) of the Utah Code.  If so, the Court must also determine whether Quality Linen is

an "initial transferee" under § 550(a)(1) of the Bankruptcy Code.

The Trustee has submitted the Motion, Memorandum in Support, and Reply

Memorandum in Support along with four affidavits and an expert report from accountant Gil A.

Miller (Miller).  The Defendants have submitted a Response and Memorandum in Support

(Response) accompanied by two affidavits.  The Court has considered the facts properly before it

and the written and oral arguments presented, and has conducted an independent review of

applicable law.  Based on the foregoing, the Court makes the following ruling.

## I.  JURISDICTION AND LEGAL STANDARD

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H), and (O), and the Court

may enter a final order.  Federal Rule of Bankruptcy Procedure 7056 makes summary judgment

appropriate when, after consideration of the record, the Court determines that "there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."[1]  In applying this standard, the Court examines the factual record in the light most

favorable to the nonmoving party.[2]  The party opposing summary judgment may not rely on mere

allegations or denials in its pleadings or briefs, but must identify specific and material facts for

trial and significant probative evidence supporting the alleged facts.[3]  There is no genuine issue

---

[1]    FED. R. CIV. P. 56(c).

[2]    *See Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

[3]    *Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1284 (10th Cir. 1988); *see also* Local
Rule 7056-1 (setting forth the requirements for raising factual issues in summary judgment motions and

of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party."[4]  Stated differently, "[t]he mere existence of a scintilla of evidence in

support of the nonmovant's position is insufficient to create a dispute of fact that is genuine."[5]

At all times, however, the moving party has the ultimate burden of establishing that it is entitled

to summary judgment.[6]

The Court concludes that no genuine issue of material fact has been raised by the

Defendants and that summary judgment in favor of the Trustee is appropriate on the legal

questions presented.

## II.  UNCONTESTED FACTS

Unless otherwise noted, the following undisputed facts are taken from the parties'

pleadings as supported by their accompanying affidavits and, in the Trustee's case, the expert

report of Miller.

The Debtor was incorporated in Utah in 1989, and Billie Crocker was the president and

sole shareholder of the Debtor since its incorporation.  Prior to its bankruptcy, the Debtor

provided legal and title insurance services through its business names of City Title Insurance

Agency and City Title Insurance Brokerage.  Billie Crocker met Wayne "Reed" Ogden (Ogden)

in approximately July 2002.  Ogden held himself out as a representative of a real estate

investment company known as Empire Investment Group, LLC (Empire) that purchased

---

responsive pleadings).

[4]    *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[5]    *Herrick v. Garvey*, 298 F.3d 1184, 1190 (10th Cir. 2002) (internal quotes omitted).

[6]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

properties and quickly resold them at substantial profits. Ogden told Billie Crocker that he was planning to acquire and develop a property in Kiowa, Colorado, and he solicited numerous purported "investors" to deposit funds in a Bank One checking account owned by the Debtor. The Defendants, however, never deposited any funds with the Debtor for this project or any other project.

By the time the investors' deposits were being made, the various funds in the Debtor's checking account had already been commingled to the point that tracing of any particular depositor's funds, including the Debtor's own funds, was rendered impossible. Many disbursements were made by the Debtor from the checking account based on signatures that have been challenged as forgeries committed by Ogden and Ogden's representations that the disbursements were for Kiowa acquisitions and development costs. Some Kiowa investors were repaid their investments in full, while some were repaid only a fraction of their investment or nothing at all.

Defendant Crayk is one of four principals of Quality Linen. In April 2002, prior to the July meeting between Billie Crocker and Ogden, Quality Linen loaned $150,000 to Crayk at Crayk's request so that he could invest the money in "a real estate project of Empire Investment Group LLC." The money was actually invested "in the Empire real estate project" in May 2002.[7] At the hearing on September 22, 2006, Defendants' counsel admitted that Crayk actually

---

[7]        In their papers, the Defendants did not specify into which Empire-run real estate project Crayk invested $150,000 in May 2002 or with what entity Crayk deposited the money except for admitting that it was not the Debtor. The Defendants' Response also alleges, without any factual support or description, that Crayk actually made "multiple investments in an Empire real estate project." At the hearing, Defendants' counsel stated her belief that Crayk had invested at least $800,000 over an unspecified period of time in Empire ventures, and counsel's statements were inconsistent insofar as she alleged that Crayk invested in either several "Empire-related real estate projects" or solely the Kiowa project. At any rate, there are no facts to support any of these assertions.

invested the money with Rocky Mountain Properties (Rocky Mountain) and not Empire itself.[8]

During October and November 2002, Crayk spoke "repeatedly" with Ogden and demanded the

return of the money that he had invested. During one of these conversations, Crayk mentioned to

Ogden that he needed his investment returned to him, in part, because he had taken a loan from

Quality Linen and needed to repay his company. He never instructed Ogden to send a check

directly to Quality Linen.

On December 2, 2002, Quality Linen received a check for $150,000 from Rocky

Mountain. Crayk instructed Quality Linen's co-general manager and controller, Lowell Hadley

(Hadley), to apply the funds against Crayk's loan. Crayk then instructed Hadley to disburse

another $50,000 directly to Crayk.[9] The Rocky Mountain check was twice refused for

insufficient funds, but Hadley had already performed the accounting adjustments on December 4,

2002 and made the additional $50,000 disbursement to Crayk before learning that the check had

bounced. The next day, December 5, Quality Linen received the $150,000 check from the

Debtor under its City Title business name and signed by Billie Crocker (check #1577). This

check cleared the bank on December 6. The adjustments to Quality Linen's records already

having been made, Hadley did not take any further accounting actions upon receipt and clearance

of the City Title check to Quality Linen. An additional City Title check for $150,000 signed by

Billie Crocker and made out to Crayk himself (check #1578) also cleared the bank on December

---

[8]    Neither side in this case described the nature of Rocky Mountain other than to state that it was a "third party," i.e., a distinct entity that was not merely a business name of Empire, Ogden, the Debtor, or Billie Crocker.

[9]    In Quality Linen's records, the $150,000 loan was categorized as a $75,000 loan to Lynn Crayk and a $75,000 loan to Lee Crayk. Lee Crayk is not a defendant in this adversary proceeding, and no party has alleged that anyone other than Lynn Crayk received the full $150,000 loan from Quality Linen and invested the full amount of that loan with Rocky Mountain by himself.

6, 2002.[10]  An involuntary petition was filed against the Debtor on February 19, 2003 — 75 days

later.

After questioning by the Court at the September 22 hearing, Defendants' counsel orally

requested leave to supplement the affidavits of Crayk and Lowell with further affidavits or

possibly live testimony setting forth the particular Empire-related projects in which Crayk

invested and how much Crayk had invested in such projects over time.  Defendants' counsel also

attempted to cull additional supporting facts for the Response from both the Trustee's

Memorandum in Support of the present Motion and the Trustee's Memorandum in Support of

Motion to Consolidate Adversary Proceedings and Extend Deadlines (Consolidation Motion)

filed on January 19, 2005 in adversary proceeding #03-2452.[11]  As more fully discussed below,

the oral motion is denied both for untimeliness and lack of merit, and the attempts to establish

additional facts using the Trustee's own papers do nothing to create a genuine issue of material

fact.

---

[10]    In his affidavit, Miller avers that check #1577 was "made payable to Quality Linen and
endorsed by Billie Crocker" and that check #1578 was "made payable to Lynn Crayk and endorsed by
Billie Crocker."  Of course, "endorse" is a term of art in commercial paper law that means "to sign one's
name as a payee on the back of (a check) in order to obtain the cash or credit represented on the face."
*See* http://www.m-w.com/dictionary/endorse.  One could read Miller's affidavit literally to find that
Billie Crocker "endorsed" the back of the Quality Linen and Lynn Crayk checks and had the money
deposited into her own, or perhaps the Debtor's, bank account.  At the hearing, however, the parties
clarified that it was indeed the Defendants who received $150,000 each from the Debtor.  This
clarification is also factually supported by the bank statements attached to Miller's expert report included
in his affidavit and the Defendants' admissions contained in their respective responses to Request for
Admission No. 1 in the Trustee's First Set of Discovery Requests.

[11]    The instant adversary proceeding was one of the actions consolidated for certain
purposes as a result of the Trustee's Consolidation Motion.  Although that motion and the supporting
memorandum were not actually filed in this adversary proceeding, a docket entry remark was entered in
this case on January 20, 2005 indicating that the Consolidation Motion had been filed in adversary
proceeding #03-2452.

## III.  DISCUSSION

Under § 548 of the Bankruptcy Code, a trustee may avoid voluntary transfers of a debtor's property interests if the debtor "received less than a reasonably equivalent value in exchange for such transfer[s]" and the debtor "was insolvent on the date that such transfer[s were] made . . . ."[12]  In this case, the Defendants have not contested that any of these required elements of a constructively fraudulent transfer have been met except for whether the Debtor received "reasonably equivalent value" in exchange for its transfer of a total of $300,000.[13]

### A.     Reasonably Equivalent Value

Although the Defendants admit that they never deposited any funds into the Debtor's checking account, Crayk alleges that he provided reasonably equivalent value to the Debtor in a different form in exchange for the challenged transfers.  Crayk claims in the Defendants' Response that "[b]ecause Mr. Crayk made multiple good faith investments in Empire-run projects, and Empire and the Debtor were part of the same fraudulent scheme, Mr. Crayk maintains a claim against each of those entities for, among other things, negligence.  The Transfers reduced the amount of Mr. Crayk's claim against the Debtor, and its fellow

---

[12]      11 U.S.C. § 548(a)(1)(B)(i), (ii)(I).

[13]      Section 25-6-5(1)(b) of the Utah Code is essentially identical to § 548(a)(1)(B) of the Bankruptcy Code in terms of their "reasonably equivalent value" analyses, and the Trustee does not need to make use of the Utah Code's extended reachback provisions in the circumstances of this case. Accordingly, the Court will only address § 548 of the Bankruptcy Code, but its analysis is equally applicable to a cause of action based on Utah state law.  *Cf. Stillwater Nat'l Bank & Trust Co. v. Kirtley (In re Solomon)*, 299 B.R. 626, 631 n.16 (10th Cir. BAP 2003) (recognizing a similar analysis between the Bankruptcy Code and Oklahoma state law).

schemers."[14]  There is no assertion in the Response or elsewhere that Quality Linen provided any

value whatsoever to the Debtor, let alone any reasonably equivalent value.

At the hearing, Defendants' counsel theorized as follows.  Crayk admittedly deposited

funds with Rocky Mountain, and counsel said that "we understand" that this money was

"intermingled" or "commingled" with Empire funds.  She then alleged that these commingled

funds were sent to the Debtor, based on the fact contained in the Trustee's pleadings that Empire

deposited and induced unspecified others to deposit money with the Debtor.  The Debtor

allegedly should have never had these funds, yet Empire allegedly had access to and was allowed

to manipulate the Debtor's bank account to disburse funds.  The money was then sent by the

Debtor to the Defendants in the form of the presently challenged transfers.

The most glaring difficulty with Crayk's allegations in the Response and the assertions by

Defendants' counsel at the hearing is that they are unsupported by facts contained in the record.

Crayk invested $150,000 with Rocky Mountain for an unknown real estate venture before Billie

Crocker ever met Ogden, and neither Crayk nor Quality Linen ever deposited any money with the

Debtor.  Furthermore, neither Crayk's nor Hadley's affidavits address the issue of any alleged

claims against the Debtor.  There are simply no facts connecting Rocky Mountain to Empire and

then to the Debtor.  And there is absolutely no specificity in the description of any alleged causes

of action against the Debtor, the basis for any Debtor liability, or the alleged damages resulting

therefrom.  Even if Empire or Rocky Mountain committed bad acts in their respective business

---

[14]     The Trustee argues in his Reply that if the Court finds that these allegations in the
Defendants' Response raise genuine issues of material fact precluding summary judgment on the basis of
constructively fraudulent transfers under § 548(a)(1)(B), then summary judgment is now appropriate on
the basis of preferential transfers under § 547(b).  Because this issue was raised neither in the Motion nor
at the hearing, the Court believes that it is premature to address such an argument at this time.

ventures that damaged the Defendants, the Court can glean no connection between such bad acts and the Debtor's actions in this case based on the facts in this record.

Supplemental affidavits and the additional facts alleged at the hearing by Defendants' counsel would do nothing to save the factually deficient Response. Counsel argued that the Trustee's Memorandum in Support of this Motion and the Memorandum in Support of the Consolidation Motion show, respectively, that "Ogden solicited numerous 'investors' in the Kiowa Property to deposit funds into the Crocker Companies' Bank One Checking Account" and that Empire itself "deposited, and induced others to deposit, various funds into an escrow account with Crocker Companies, Inc."[15] But even so, these generalized facts do nothing to connect the particular Defendants in this case to Ogden or Empire's solicitation activities, nor do they support counsel's "understanding" about the connection or commingling of funds between Rocky Mountain and Empire. Miller's report also shows that Empire deposited only $100,000 into the Debtor's bank account between February 1, 2002 and February 28, 2003 despite Defendants' counsel's allegations that Crayk's investment of $150,000 (let alone $800,000) was funneled from Rocky Mountain through Empire then to the Debtor during this time frame. And all of this is to say nothing of the fact that Billie Crocker had not even met Ogden until after Crayk had invested his money with Rocky Mountain. Because of these deficient efforts at connecting Rocky Mountain to Empire to the Debtor, it is ultimately immaterial whether Crayk invested in the Kiowa project or some other "Empire-related" real estate project.

---

[15]    The Court notes that the "fact" pulled from the Consolidation Motion is contained in the "Background" section of the Memorandum in Support and is otherwise unsupported, at least insofar as Defendants' counsel alleges that Empire (as opposed to Ogden) induced others to deposit funds into the Debtor's bank account.

As stated in the Advisory Committee Notes to the 1963 amendments to Federal Rule of

Civil Procedure 56, "[t]he very mission of the summary judgment procedure is to pierce the

pleadings and to assess the proof in order to see whether there is a genuine need for trial."  In this

two-year-old adversary proceeding, the only facts supporting Crayk's allegations in the Response

are the existence of some undefined relationship between Billie Crocker and Ogden that arose

after Crayk's investment had already occurred, and the existence of two checks written from City

Title's bank account that were signed by Billie Crocker with the word "Empire" in the memo

lines.  This is no more than a scintilla of evidence supporting Crayk's allegations and cannot

preclude summary judgment in the Trustee's favor against Crayk for a constructively fraudulent

transfer under § 548(a)(1)(B).[16]  Quality Linen made no attempt in its own right to dispute any of

the facts regarding reasonably equivalent value, and summary judgment is also appropriate in the

Trustee's favor against Quality Linen.

**B.      Quality Linen as Immediate Transferee**

Having determined that the challenged transfers totaling $300,000 are avoidable under

§ 548(a)(1)(B), the Court must now determine whether the Trustee can recover the $150,000

transfer made to Quality Linen from Quality Linen itself as an "initial transferee" under

---

[16]      The Court fully recognizes that quantifiable indirect benefits can constitute "value" under § 548(a)(1)(B), as can dismissal of a lawsuit or reduction in a claim for restitution based on an investment in a debtor's Ponzi scheme.  *See, e.g.*, *Clark v. Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237 (10th Cir. 1993) (quantifiable indirect benefits); *Manuel v. Twenty Grand Offshore, Inc. (In re Ocean Line of N. Florida)*, 137 B.R. 540 (Bankr. M.D. Fla. 1992) (dismissal of pending lawsuit); *Jobin v. McKay (In re M&L Bus. Mach. Co., Inc.)*, 84 F.3d 1330 (10th Cir. 1996) (reduction in restitution claim for Ponzi scheme investment); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843 (D. Utah 1987) (same).  But Crayk's unsupported Response does not even allege sufficient facts to raise a genuine issue of material fact as to the Debtor's receipt of any value at all from Crayk, let alone reasonably equivalent value.

§ 550(a)(1).  Analogizing itself to a bank that simply received funds from a transferor and

credited them to one of its client's accounts, Quality Linen alleges in the Response that it was

acting merely as an agent for Crayk and a mere "conduit" through which the money flowed.

Both parties are correct that the Tenth Circuit has adopted the "dominion and control" test for

determining whether an entity was an initial transferee or a mere conduit.[17]  Under this test, "the

minimum requirement of status as a transferee under § 550 is dominion over the money or other

asset, the right to put the money to one's own purposes."[18]  Physical possession alone is

insufficient to satisfy the test, and the Tenth Circuit has distinguished a "transferee" from a

"possessor," "holder," "agent," "courier," or "anyone who touches the money."[19]  The Tenth

Circuit has also made clear that exercising dominion and putting money to one's own purposes

by acting as an *unfaithful* courier is insufficient to establish "transferee" status.[20]

Based on the affidavits of Crayk and Hadley, Quality Linen argues that it only received

the $150,000 City Title check made out to Quality Linen as agent for Crayk and that it had no

discretion as to how to apply the funds.[21]  It is axiomatic that corporate entities can only act

through their officers, directors, and other agents.[22]  And it was necessarily Crayk in his capacity

---

[17]   *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1202 (10th Cir. 2002).

[18]   *Id.*

[19]   *See, e.g.*, *Rupp v. Markgraf*, 95 F.3d 936, 941 (10th Cir. 1996).

[20]   *Id.*

[21]   Crayk asserts in his affidavit that he never instructed Ogden to send a check to Quality
Linen, but this undisputed fact is immaterial.  It was City Title that authored and transferred the
challenged checks, and the Court must look at the nature and substance of the actual challenged transfers.

[22]   *ISTS, Inc. v. Sunvic, Inc.*, Civ. A. No. 89-A-1838, 1990 WL 117856 at *5 (D. Colo.
August 6, 1990).

I:\LAW\OPINIONS\Opin0494.wpd                        -11-

as a director of Quality Linen that instructed Hadley as controller to apply the Quality Linen

check funds in a particular way.  If Crayk were acting as a mere individual, his instructions

would have amounted to no more than a suggestion and would not have been able to deprive

Quality Linen of discretion over the funds as alleged by the Defendants.  Thus, Quality Linen did

exercise dominion and control over the funds, albeit due to the actions of its co-Defendant, and

was "free to invest the money in lottery tickets or uranium stocks" until such time as Crayk

issued his corporate directive to the contrary.[23]

Additionally, Quality Linen itself received the direct benefit of the $150,000 transfer —

payoff of its loan to Crayk — in a one-step rather than two-step transaction.  As discussed by the

Tenth Circuit in *Rupp v. Markgraf*, a situation in which a debtor's check is paid directly to a third

party's creditor should be contrasted with a situation in which a debtor's check is paid to the third

party who then pays his own creditor.  Although not necessarily dispositive, the distinction is

certainly indicative of the fact that the initial transferee for § 550(a)(1) purposes is the third

party's creditor in the first scenario and the third party itself in the second scenario.[24]  The

Debtor's payment directly to Quality Linen, even if caused by Crayk's demands against Ogden,

and Quality Linen's application of that payment further support the Court's reasoning above that

Quality Linen exercised the requisite dominion and control over the $150,000 it received from

---

[23]     *Malloy v. Citizens Bank of Sapulpa (In re First Sec. Mortg. Co.)*, 33 F.3d 42, 44 (10th Cir. 1994) (internal quotes and diacritics omitted).  This fact also distinguishes cases in which the transferor gave specific instructions to the alleged intermediary on how to apply the transferred funds. *See, e.g.*, *id.*; *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988).  The Debtor provided no such instructions in this case.

[24]     *Rupp v. Markgraf*, 95 F.3d at 939-40.  The Seventh Circuit also stated straightforwardly in *Bonded Financial Services* that if the note accompanying the debtor's check had told the bank to "use this check to reduce Ryan's loan" from the bank instead of "deposit this check into Ryan's account," § 550(a)(1) would provide a "ready answer" insofar as the bank would be the initial transferee in the first scenario but not in the second.  *Bonded Fin. Servs.*, 838 F.2d at 892.

the Debtor. Unlike the typical conduit, the money did not flow through to anyone else once it

was received by Quality Linen; it stopped and was applied by Quality Linen for its own purposes.

And this is to say nothing of the fact that two checks were ultimately received and cashed by the

Defendants — one by Quality Linen for $150,000 and one by Crayk himself for $150,000,

although the factual record only indicates that one investment of $150,000 by Crayk into Rocky

Mountain ever occurred.

The Court therefore finds that insufficient facts have been shown by Quality Linen to

raise a genuine issue of material fact as to its status as an initial transferee under § 550(a)(1) and

that recovery from Quality Linen of $150,000 is appropriate.

## IV.  CONCLUSION

In sum, the Defendants have failed to set forth sufficient facts to challenge the Trustee's

well-plead and factually supported assertions on the issue of reasonably equivalent value.

Accordingly, the Trustee is entitled to judgment as a matter of law under § 548(a)(1)(B) avoiding

both transfers of $150,000 for a total recovery of $300,000.  The Defendants have also failed to

set forth sufficient facts to challenge the Trustee's well-plead and factually supported assertions

regarding Quality Linen's status an initial transferee under § 550(a)(1), and recovery from both

Crayk and Quality Linen for $150,000 each is appropriate as a matter of law.  To clarify, Quality

Linen and Crayk are not jointly and severally liable for a judgment of $300,000; rather, Quality

Linen and Crayk are each individually liable for a $150,000 judgment.

The Trustee is hereby directed to prepare a separate Judgment in accordance with this

Memorandum Decision.

------------------------------END OF DOCUMENT------------------------------

_____ooo0ooo_____

SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION ON TRUSTEE'S MOTION**

**FOR SUMMARY JUDGMENT** will be effected through the Bankruptcy Noticing Center to

each party listed below.


Jeremy C. Sink
McKay Burton & Thurman
170 South Main Street
Suite 800
Salt Lake City, UT  84101
    *Counsel for Plaintiff*


Danny C. Kelly
One Utah Center
201 South Main Street
Suite 1100
Salt Lake City, UT  84111
    *Counsel for Defendants*

ORDER SIGNED